**John GERMANN, Plaintiff,**

v.

**CITY OF KANSAS CITY, MISSOURI, et al., Defendants.**

No. 80–0499–CV–W–2–9.

United States District Court, W.D. Missouri, W.D.

Jan. 31, 1984.

Sandra Midkiff, Kansas City, Mo., for plaintiff.

Daniel G. Jackson, III, Asst. City Atty., Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

BARTLETT, District Judge.

In this case, plaintiff, a captain in the Kansas City Fire Department, claims that the City of Kansas City and John Waas, Director of the Department of Fire until April 9, 1980, and Edward Wilson, Waas' successor, violated his federal constitutional rights by not promoting him to battalion fire chief. Specifically, plaintiff alleges that defendants refused to promote him because of what he said as president of the union and because of his union membership. Also, plaintiff asserts that the defendants violated § 105.510 R.S.Mo. by discriminating against him because of his union affiliation.

*Findings of Fact*

Plaintiff John Germann has been employed by the Kansas City, Missouri, Fire Department for over 22 years. Since July 27, 1971, he has been a fire captain. From January 1, 1976, to December 31, 1981, Germann was President of Local Union No. 42 of the International Association of Firefighters, AFL–CIO (hereafter union).

The Kansas City, Missouri, Fire Department is part of the municipal government of the City of Kansas City and is supervised and controlled by the Director of the Fire Department. "The director of the fire department shall have charge of the prevention and suppression of fires and of all employees, buildings and equipment used for this purpose." § 31, City Charter. The Director of the Fire Department was commonly referred to as the "Chief."

Defendant John Waas (hereinafter Waas) was the Director of the Fire Department during all times relevant to this lawsuit. Waas retired as Fire Director on April 9, 1980. Since Waas' retirement, defendant Edward Wilson has been acting and then permanent Director of the Kansas City, Missouri, Fire Department.

Below the fire chief in the chain of command are the deputy fire chiefs, battalion fire chiefs, and fire captains. Seven battalion chiefs are on duty at a time. Each battalion chief supervises six to eight fire companies totalling 25–30 people. Six to eight fire captains report directly to each battalion chief.

In October, 1975, the union went on strike. All union members, including deputy and battalion chiefs, refused to report to work. Chief Waas was the only professionally trained firefighter on duty for a period of four days.

Thereafter, the city and the union executed a Memorandum of Understanding which provided for the reorganization of the fire department, raised wages and prohibited supervisors from belonging to the same labor organizations as the employees they supervised.

The planned reorganization of the fire department was referred to in Article XXII of the agreement in part as follows:

The city is endeavoring in good faith to implement a plan of reorganization for the Fire Department. Those increases tied to the plan will be paid on the dates set forth in this Memorandum provided that the Union and its members fulfill their commitments herein. For the purpose of this commitment, the implementation of the plan shall be measured by the scheduling (or proposed scheduling) of Firefighters on other than a 24 hour workday basis. The Union and its members agree that they will act in good faith to implement the plan and will use their best efforts to insure its success. . . .

The union recognized in Article I of the agreement that:

[t]he City feels that it needs a satisfactory number of supervisors who are not affiliated with any labor organization which admits to membership nonsupervisory fire service employees in order to effectively implement the reorganization of the Fire Department and generally for the purpose of management of the Fire Department. . . .

Local No. 42 was recognized as the "exclusive bargaining representative for all firefighters, fire apparatus operators, captains . . . and any employees in positions which may be created below the rank of captain. . . ." Memorandum, Art. I. However, the union was prohibited from representing "supervisors, including battalion chief, deputy fire chief, superintendent of garage, superintendent of alarm, and chief fire prevention inspectors." *Id.*

Nothing in the Memorandum of Understanding was to be "construed as an attempt to limit the discretion of the appointing authority conferred by Article V, Section 121 of the Charter." Memorandum, Art. IV § 4. Under the city charter, a battalion chief vacancy was filled by the Chief selecting one of the top five candidates from the battalion chief eligibility list.

Waas was responsible for implementing the reorganization of the fire department. During the planning period for implementation of the new fire plan from July 9, 1976, to May 1, 1977, Germann became convinced that Waas was not going to follow the Memorandum of Understanding in implementing the plan. Germann believed that he knew more than Waas about how to interpret the Memorandum of Understanding because Germann helped negotiate the agreement.

From May 1, 1977, into 1979, the city attempted to implement the new work schedule. It was a period of turmoil and conflict between the union and the management of the fire department. One deputy fire chief accurately described the situation as a "we" against "them" atmosphere rather than "us" against the problem of how best to operate the fire department. Germann, as president of the union, vigorously led the union in opposing the manner in which the fire plan was being implemented by the fire department management. He repeatedly expressed his belief that the manner in which the city was attempting to implement the plan violated union members' rights.

Waas believed that it was his responsibility as chief to find a way to implement the city's fire plan while maintaining the fire fighting capability of the department. Waas' efforts to implement the fire plan put him squarely in the middle of the heated dispute between the union and the city. During this tumultuous period Waas needed chief officers whom he could count on to project his policies in the field. Because the situation in the field was constantly changing, Waas could not personally make and carry out all of the decisions necessary to implement the fire plan. Waas had to rely on his deputy chiefs and battalion chiefs to implement diligently and faithfully the city's fire plan, and apply his general directives to new situations.

The change from a twenty-four hour shift to an eight hour shift required more personnel at virtually every level of the fire department, including battalion chief.

There were seven battalion chief openings from September 21, 1977, to April 6, 1980, when Waas retired. During the period from September 21, 1977, to September 19, 1979, Germann was ranked number one on the battalion fire chief eligibility list.[1] Whenever a battalion chief vacancy occurred, a certification list was prepared showing the current ranking of people on the battalion chief eligibility list. Waas made seven appointments from certification lists based on the September 21, 1977, battalion chief eligibility list:

1) On May 22, 1978, the third person on the certification list was promoted.

2) On June 19, 1978, the second and fifth people on the certification list were selected.

3) On August 28, 1978, the third person on the certification list was selected.

4) On January 29, 1979, the third and fourth persons on the certification list were promoted.

5) On April 23, 1979, the fifth person on the certification list was selected.[2]

Waas considered Germann for each of these vacancies but did not promote him.[3] On only one occasion was Germann the only person skipped over to reach the person selected by Waas for promotion. On two occasions Waas skipped over Germann and three others to reach the name selected. Germann was not the only person ranked in the top five on the September 21, 1977, eligibility list who was not selected for promotion from that list. Two of the original top five names on the September 21, 1977, eligibility list were not selected for promotion during the period that this eligibility list was in effect.

Germann was not promoted because 1) Waas reasonably believed that to promote Germann to management would threaten the efficiency, discipline and morale of the fire department; and 2) Waas reasonably believed that Germann would not resign from the union if promoted to battalion chief.

Waas' concern about the effect Germann's promotion would have on departmental efficiency, discipline and morale was based in part on a letter dated May 11, 1977, which Germann directed to "Chief Waas." Germann sent copies to city officials, other fire department officers, and union officials. Germann had the following to say in this letter about Waas and his efforts to implement the city's fire department policy:

In answer to your letter of May 6, how dare anyone who has done as much as you to tear the Kansas City Fire Department to shreds accuse someone else of attempted obstruction or alteration. With your hand at the controls, the Kansas City Fire Department could not possibly be more completely obstructed by anyone else on the face of the earth.

Nothing would suit me better than to have a Fire Chief who would read and understand his own rules, give his word on an issue and then not violate his own word by his every action as you have....

....

1. Germann was ranked third on the September 18, 1979, eligibility list which was in effect for the balance of Chief Waas' tenure. However, no appointments were made from that list.

2. Plaintiff's evidence in this case related to the reasons Waas failed to appoint Germann from the September 21, 1977, eligibility list. No evidence was introduced about any promotions made after April 9, 1980, the date defendant Wilson became Chief. Therefore, there is no factual basis for a claim against defendant Wilson.

3. Although Germann said that he talked to Thomas Lewinsohn about Waas' failure to promote him, Germann never filed a grievance with Lewinsohn who was Personnel Manager for the city. Germann conceded that Lewinsohn was fair-minded and impartial. Germann testified that Lewinsohn, in contrast to Waas, never had gone back on his word. On December 6, 1978, Germann filed a charge of discrimination against Kansas City, John Waas and Robert Kipp, City Manager, with the Equal Employment Opportunity Commission. Germann alleged that he had been passed over for promotion because of his race.

I have been passed over for promotion to the position of—battalion fire chief because of my race (white) due to the city of Kansas City's affirmative action plan. I have lost and continue to lose pay, fringe benefits, seniority rights, and eligibility for future promotions.

If you are really interested in seeing the Memorandum upheld, I suggest some study courses for yourself and the rest of the chief officers under the direction of someone who does not carry such a pitifully twisted outlook toward the employees of the department as you seem to have developed. . . .

Discipline and morale in the department depended on respect being shown to rank. Waas reasonably believed that the tone and content of this letter was personally insulting and an inappropriate response to his letter of May 6.[4] Germann's letter confirmed Waas' belief that Germann did not respect him and would not work under Waas' leadership to implement the city's fire plan. Waas reasonably believed that the letter illustrated the threat Germann posed to a harmonious leadership team dedicated to implementing city fire department policy.

In early June, 1978, before the June 19, 1978, promotions were announced, Waas telephoned Germann. Germann testified that Waas told him that he would have to resign as union president *before* Waas would consider promoting him. According to Germann, he replied that he would not resign from the union *until* he was promoted. Mrs. Germann heard her husband's end of the conversation and had the "feeling" that he would resign from the union if promoted.

Waas recalled that he telephoned Germann to confirm that he would comply with the ordinance and resign from the union if appointed battalion chief. Germann told him that he planned to continue as president of the union for another term. Therefore, Waas concluded that Germann was not interested in being considered for promotion because Germann could not be a member of the union and battalion chief.

At the time Waas telephoned Germann, Germann was leading a state court challenge to the validity of the ordinance prohibiting battalion chiefs from joining the same union as rank and file employees of the department. Therefore, it was entirely reasonable for Waas to attempt to determine whether Germann would accept promotion and then refuse to resign from the union in order to focus the issues in the lawsuit. Waas did not need another problem at that time.

Germann's testimony about the telephone conversation clearly revealed a personal hostility toward and suspicion of Waas. Germann believed that Waas was trying to trick him into resigning as union president without having any intention of promoting him. As a result of Germann's suspicion about Waas' motives and his hostility toward Waas, his responses to Waas' inquiries were evasive. In the context of the times, Waas reasonably concluded that Germann was saying that he was not interested in joining the management team that he had been so vigorously opposing. Waas reasonably believed that Germann had told him that he would not resign from the union if selected for promotion.

In early 1979, after the January 29, 1979, promotions were announced, an incident occurred in Waas' office which further confirmed Waas' concern about Germann's suitability for promotion to battalion chief. Germann and Waas sharply differ on what happened at this meeting. Waas testified that Germann came into his office by himself and demanded to know why he had not been promoted to battalion chief. Waas declined to respond because of Germann's hostile attitude. Germann then leaned over his desk, shook his fist at Waas, and called Waas a "chicken shit."

---

4. Germann claimed that this letter was a justified response to Waas' letter of May 6 which read as follows:

> This is to register my objection to the officers of Local # 42 of the fire fighters' union making frequent visits to the Deputy Chief's office at Fire Station # 10 to obstruct and try to alter the operation of the Fire Department.

> This practice is in direct violation of the Memorandum of Understanding, which sets forth a Labor/Management Committee to review procedures. I respectfully request that you refrain from any further such practice.

The reasonable, businesslike tone of Waas' May 6 letter stands in stark contrast to the emotional, personal and hostile tone of Germann's response.

Germann testified that he went to see Waas both as president of the union and personally to make inquiry about why he had not been promoted. According to Germann, all Waas would say is that Germann had not been appointed because of "certain activities." Germann attempted to get Waas to agree that "certain activities" referred to Germann's actions representing the union. Waas would neither admit nor deny Germann's suspicion. Germann denied that he called Waas a "chicken shit" and that he shook his fist at Waas. Germann conceded that he accused Waas of not having "guts" enough to state the real reason for not promoting him. Two union officials who testified that they were with Germann supported Germann's version of this meeting.

The Court is convinced that Waas' version is closer to the truth than Germann's. The emotion still evident in Germann's voice when he testified about the meeting strongly indicates that the discussion was not as calm as Germann's testimony would lead one to believe. The Court believes that Germann verbally attacked and berated Waas. Waas' dismay at the intensity of Germann's attack was still apparent as he testified about the event.[5] However, even if Germann's version of this meeting were entirely credible, Germann's accusation that Waas did not have "guts" enough to give Germann the real reason for not appointing him substantiates the reasonableness of Waas' conclusion that to promote Germann to Waas' management team would threaten the institutional efficiency of the fire department.

On approximately forty different occasions from November 22, 1977, to October 31, 1979, Germann was assigned to work temporarily as a battalion chief. Working out of class was intended in part to give people on the eligibility list for promotion experience in the position they were seeking. Germann was assigned temporary duties as battalion chief by a deputy chief and not by Waas. The fact that Germann worked out of class so frequently indicated that he was qualified for battalion chief, a conclusion not contested by defendants. However, Germann's temporary assignment to battalion chief duties does not indicate that he was the best qualified for promotion to a permanent position on Waas' management team.

In promoting seven people off the September 21, 1977, eligibility list, and in not promoting Germann, Waas reasonably exercised the discretion vested in him by the City Charter and the Memorandum of Understanding with the union. Waas' refusal to promote Germann was not in retaliation for his union activities. Germann was not promoted by Waas because Germann's behavior demonstrated that he would not comply with and work diligently to support the city's fire department policies. Waas reasonably concluded that to promote Germann to management would threaten the efficiency, discipline and morale of the fire department.

### Conclusions of Law

This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343. Plaintiff alleges a violation of 42 U.S.C. § 1983.

■■■ The City may not condition public employment on a basis which infringes on an employee's constitutionally protected interest in freedom of expression. *Connick v. Myers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Public employees may not "be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation" of the department in which they work. *Pickering v. Bd. of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). "The first amendment restrains the government from retaliating against a public employee on the basis of the employee's speech or associations."

---

5. An article in the Kansas City Star dated February 8, 1979, quoted John Tvedten a union official at the time, as follows: "He [Germann] went in there and told him [Waas] how the hog ate the cabbage." Tvedten testified at trial that a hog goes after cabbage "vociferiously."

*Hughes v. Whitmer*, 714 F.2d 1407, 1418 (8th Cir.1983).

In *Hughes*, the Eighth Circuit Court of Appeals considered whether the Missouri Highway Patrol had transferred Hughes in order to retaliate against him for protected speech-related activities. The Court emphasized that the First Amendment rights of government employees are subject to the state's interest in providing efficient public services.

> While government employees do not relinquish their first amendment rights when they enter public service, those rights, unlike the rights of the citizenry-at-large, are subject to the state's paramount interest in promoting the efficiency of the public services it performs through its employees. *Rosado v. Santiago*, 562 F.2d 114, 117 (1st Cir.1977); *Santos v. Miami Region, U.S. Customs Service*, 642 F.2d 21, 25 (1st Cir.1981). As the Supreme Court emphasized in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–1735, 20 L.Ed.2d 811 (1968), "the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Accordingly, public employers may legitimately curtail the speech activities of their employees to promote efficiency, loyalty, and departmental morale, provided these interests outweigh the employees' speech interest. *Id.* Therefore, in determining whether the transfer here infringed Hughes' first amendment rights, our duty as enunciated by the Court in *Pickering* is to weigh Hughes' interests in speaking and gathering information against the Patrol's interest in promoting efficiency, discipline and morale. In weighing these interests, we are to consider both the nature of the employment relationship and the nature of the speech activity involved. *Pickering v. Board of Education*, 391 U.S. 563, 569–73, 88 S.Ct. 1731, 1735–1737, 20 L.Ed.2d 811.

*Id.* 714 F.2d at 1418–19 (footnote omitted).

In considering the governmental interests at stake, the Court commented about the Missouri Highway Patrol in terms that are equally applicable to the Kansas City, Missouri, Fire Department:

> More so than the typical government employer, the Patrol has a significant government interest in regulating the speech activities of its officers in order "to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." *Gasparinetti v. Kerr*, 568 F.2d 311, 315–316 (3d Cir.1977), *cert. denied*, 436 U.S. 903 [98 S.Ct. 2232, 56 L.Ed.2d 401] (1977); *also see* Note, *Free Speech and Impermissible Motive in Dismissal of Public Employees*, 89 Yale L.J., 376, 381 n. 14 (1979). As the Supreme Court recognized in *Kelley v. Johnson*, 425 U.S. 238, 246–47 [96 S.Ct. 1440, 1445, 47 L.Ed.2d 708] (1976), a police department has a substantial interest in developing "discipline, *esprit de corps*, and uniformity" within its ranks so as to insure the safety of persons and property.

*Id.* 714 F.2d at 1419 (citations omitted). See also, *Chappell v. Wallace*, —— U.S. ——, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), where in articulating the limited role the judicial branch has in reviewing military decisions affecting a soldier's constitutional rights, the Supreme Court was concerned about the "disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his supervisor into court." *Id.* at 2367 (quoting *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 676, 97 S.Ct. 2054, 2060, 52 L.Ed.2d 665 (1977) which quoted *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954)).

While the organization of the Kansas City Fire Department may differ somewhat from the Missouri Highway Patrol and the military, a "fire department, like police department, has greater than normal government interest in maintaining morale and discipline." *Hughes*, 714 F.2d at 1419.

Promoting efficiency, fostering loyalty and obedience to superior officers, and maintaining morale in the fire department are reasonable governmental interests.

In *Hughes* the Court concluded that the transfer did not infringe on Hughes' First Amendment rights.

> In striking the *Pickering* balance in this case, we are compelled to emphasize that free speech claims are not to be considered in a vacuum but must be viewed in light of the circumstances and in the context of all relevant conditions existing at the time of the asserted free speech activities. *Nor should free speech rights be utilized to provide immunity to other actions that merit condemnation, discipline or sanctions assessed in the public interest. See Mt. Healthy [City School Dist. Bd. of Ed. v. Doyle],* 429 U.S. [274] at 285–86, 97 S.Ct. [568] at 575–76 [50 L.Ed.2d 471]. *The public weal demands that public officials carry out their duties and responsibilities so that their offices are run efficiently, harmoniously and responsive to the administration of the public service they are employed to perform.* In particular, paramilitary units have a need to uphold morale, an *espirit de corps* and an affirmative public image.

*Hughes,* 714 F.2d at 1425 (emphasis added). *See also, Connick,* 103 S.Ct. at 1694.

The efficient, harmonious and responsive administration of government is more likely to be threatened where a close working relationship exists between employer and employee. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* 103 S.Ct. at 1692. *See also Hughes,* 714 F.2d at 1419–20.

In this case Germann was seeking promotion to a management position with the fire department where personal loyalty to Chief Waas and his programs was essential. During the 1977–1979 period, Waas relied on his battalion chiefs to implement, on a day-by-day basis, the city's fire plan in the face of persistent and rigorous union opposition. Close supervision was impossible; loyalty to Waas and the city was essential.

In light of the substantial governmental interest in the efficient operation of the fire department and in light of the nature of the employment relationship between Waas and his battalion chiefs, the significance of the tone and content of the May 11, 1977, letter is apparent.

> In answer to your letter of May 6, how dare anyone who has done as much as you to tear the Kansas City Fire Department to shreds accuse someone else of attempted obstruction or alteration. With your hand at the controls, the Kansas City Fire Department could not possibly be more completely obstructed by anyone else on the face of the earth.
>
> Nothing would suit me better than to have a Fire Chief who would read and understand his own rules, give his word on an issue and then not violate his own word by his every action as you have....
>
> ....
>
> If you are really interested in seeing the Memorandum upheld, I suggest some study courses for yourself and the rest of the chief officers under the direction of some one who does not carry such a pitifully twisted outlook toward the employees of the department as you seem to have developed.... It might also be enlightening at this time to study the Preamble of the Memorandum of Understanding, so you could charge yourself with the many violations you have created or allowed to exist since its signing in July, 1976.

The letter was a personal communication between Germann and his superior officer, Fire Chief Waas.

> Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also

by the manner, time, and place in which it is delivered.

*Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979).

In this letter, Germann accuses the head of the department of being a liar and of destroying the fire department. The letter carries the clear message that Germann personally dislikes Waas, has no respect for him, and believes that Waas is destroying the fire department.[6]

No great effort need be exerted to appreciate the reasonableness of Waas' decision not to promote Germann to his management team after he received Germann's May 11, 1977, letter. The letter graphically demonstrates to any reasonable person that a relationship of trust and confidence between Waas and Germann would be difficult to achieve. The letter is not of such public and social importance as to override the City's compelling public safety interest in having a fire department managed by commanding officers loyal to the Fire Chief.

Germann's distribution of copies of the letter to other members of the fire department and union officials did not transform an essentially personal communication into public speech. In fact, the distribution of copies only aggravated the effect on institutional efficiency, discipline and morale by publicizing within the department Germann's accusations against and attitude towards Waas and his policies. Efficient operation of the fire department in accordance with policies adopted by elected officials would be impossible if the First Amendment required the promotion to management of people who it is reasonably believed would not work diligently to implement those city policies and who have no loyalty to or respect for the Fire Chief.

Furthermore, before June 19, 1978, Germann had told Waas that he wanted to remain president of the union for another term. Waas reasonably concluded that Germann was not interested in promotion at that time and that he would not comply with the city ordinance and resign from the union if he was promoted. Not only was this another indication of Germann's refusal to follow city fire department policy, but it provided an independent basis for Waas not promoting Germann. Simply put, Germann was more interested in leading his union at that time than joining management. No constitutional right is implicated by Waas' reasonable reliance on Germann's voluntary choice to remain as union president for another term. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).

After the January 29, 1979, appointments, Germann confronted Chief Waas in the privacy of his office. Germann told Waas that he did not have "guts" enough to respond to Germann's belligerent inquiry about why Germann had not been promoted, he leaned over Waas' desk and shook his fist at Waas, and he called Waas, his superior officer, a "chicken shit."[7] No reasonable analysis can conclude that those were acts or comments addressing a matter of public concern. Subordinates who curse and threaten their superiors must accept the reasonable consequences of their acts.

Certainly Germann had the right to join and work for his union and to express himself personally and as union president on implementation of the fire plan. Germann fully enjoyed these rights unimpeded by defendants. However, Germann's argument that anything he said or did as president of the union cannot be considered in deciding who to promote to management of the fire department turns the First Amendment on its head. Paraphrasing the Supreme Court's conclusion in *Connick*, "it

---

6. Germann suggested that this letter could not fairly be interpreted as expressing his personal views. The tone and form of the communication speak forcefully to the contrary.

7. In the context of the conflict between the union and the city, it is not surprising that Germann would attack Waas ostensibly for not promoting him even though he had told Waas earlier he was not interested in promotion at that time.

would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with" this attempt to shroud with constitutional protection behavior reasonably believed to be destructive to governmental efficiency. 103 S.Ct. at 1694.

In *Nathanson v. United States,* 702 F.2d 162 (8th Cir.1983), Nathanson, an employee of the Corps of Engineers contended that he had been terminated because of his views on environmental policy. The Court stated that under *Pickering* both the content of speech and whether it is conveyed privately or to the general public must be considered.

We find there was ample evidence for the district court to view Nathanson's argumentative discussions with his superiors as disruptive conduct threatening the efficiency of performance of his duties.... Whether Nathanson's views were right or wrong, Parsons responded to them as behavior that was deemed bordering on insubordination. We emphasize it was not the expression of his views that the district court found led to his dismissal. Parsons did not fire Nathanson because he was an environmentalist and disagreed with the policy of the office. True, the evidence allows Nathanson to argue as much; however, the district court is the finder of fact. The district court found that because Nathanson possessed such strong views he could not efficiently carry out his duties in processing the permits....

....

We agree that the institutional efficiency of the Corps was not threatened by the content of Nathanson's views. He had every right to express these views to his superiors. However, the manner, time, and place in which he expressed these views clearly inhibited his performance in processing permits directed by his superiors.

*Id.* at 165–66.

■ Here, as in *Nathanson,* the governmental interests in promoting the efficiency and morale of a department with a crucial public safety mission outweigh Germann's interest in speaking in the manner, time, and place which he chose. Where close working relationships are essential to fulfilling public responsibility, a wide degree of deference must be accorded the employer's judgment on who to promote to management. Therefore, when defendants Kansas City and John Waas failed to promote Germann, his First Amendment rights were not infringed. To conclude otherwise would put this Court in the intolerable position of reviewing a wide range of discretionary governmental employment decisions. Neither the United States Constitution nor Congress envisioned such an intrusive role by federal courts in the operation of state and local government.

■ Having concluded that Germann was not discriminated against because he was a member of the union or because of any proposal made by him to the city relative to salaries or working conditions, plaintiff's state claim grounded on § 105.510 R.S.Mo. fails.

For the reasons stated, judgment is hereby granted in favor of the defendants City of Kansas City, Missouri; Edward Wilson; and John Waas, and against the plaintiff John Germann. Costs of this action are assessed against the plaintiff.

IT IS SO ORDERED.